van Gestel, J.
This matter comes before the Court on a motion by the plaintiff, Seaboard Surety Company (“Seaboard”), seeking partial summary judgment only as to liability against the defendants Interstate Construction Company, Inc. (“Interstate”), Gulfshore Development Corporation (“Gulfshore”), Congress Construction, Inc. (“Congress”) and William A. Nicholson (“Nicholson”) (collectively the “Indemnitors”) on Counts I, II, III, IV, V and VI[2] of the amended supplemental complaint. Seaboard also seeks an order for specific performance that the Indemnitors make a collateral deposit in the amount of $844,020.00.
The counts of the amended supplemental complaint put in issue by this motion are the following: Count I, for specific performance of an indemnity agreement; Count II, for breach of an indemnity agreement; Count III, for common-law indemnity; Count IV, for quia timet; Count V, for violation of GL. c. 93A; and Count VI for a declaratory judgment as to obligations under an indemnity agreement.

BACKGROUND

At issue is a General Agreement of Indemnity (the “Indemnity Agreement”) dated August 11, 1997, between Seaboard, on the one hand, and Interstate and Congress, on the other. Each of Interstate, Congress, Gulfshore and Nicholson are included among the “In-demnitor(s)” to the Indemnity Agreement.[3]
The first three introductory paragraphs of the Indemnity Agreement read as follows:
WHEREAS, Congress Construction Company, Inc. and/or Interstate Construction Co., Inc. of Peabody, MA (hereinafter called Contractor) may from time to time request Seaboard Surety Company .. . (hereinafter called Surety) to execute as surety or guarantor for the Contractor, or procure the execution of certain surety bonds, undertakings, guaranties, stipulations or other obligatory instruments (all such instruments being hereinafter collectively called Bonds); and
WHEREAS, the undersigned Indemnitors by executing this instrument represent that they have a material and beneficial interest in the obtaining of such Bonds by the Contractor (the Indemnitors and the Contractor being hereinafter called the Undersigned);
NOW, THEREFORE, in consideration of the execution of any one or more of such Bonds, the Undersigned, for themselves, their respective personal representatives, successors and assigns, jointly and severally, covenant and agree, with respect to all Bonds heretofore or hereafter executed for the Contractor, that:
In the Indemnity Agreement, after the foregoing, there follow 22 separate sections detailing the obligations of indemnification by the Indemnitors, some of which, or parts thereof, are hereafter quoted.
The Indemnitors under the Indemnity Agreement, agreed, among other things, in Section 6, as follows:
They will indemnify the Surety and hold it harmless from and against all liability, losses, costs, damages, attorneys fees, disbursements and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such Bonds; and they will pay over and make good to the Surety all money which the Surety or its representatives shall pay, or cause to be paid or become liable to pay, by reason of its execution of any such Bonds as soon as it shall become liable therefor, whether the Surety shall have paid out such sum or any part thereof, or not. The Surety, in its sole discretion, from time to time may advance funds to or for the account of the Contractor for or in connection with the completion of the work under any contract in connection with which it has executed or may execute a Bond or Bonds . . . and for the discharge of obligations incurred in connection with or relating thereto, and such advances shall be deemed “losses” under the terms of this instrument whether or not such advances have been so used by the Contractor.
Section 7 provides as follows:
If the Surety shall set up a reserve to cover any contingent claim or claims, loss, cost, attorneys fees *588 and/or other expenses in connection with any such Bond the Undersigned, within ten (10) days after receipt of written demand, as evidenced by registry [sic] or certified mail return receipt, will pay to the Surely current funds in an amount equal to such reserve, and any subsequent increase thereof, such funds to be held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use the same or any part thereof, at any time, in payment or compromise of any judgment, claim, liability, loss, damage, attorneys fees and disbursements or other expenses. Demand shall be sufficient if sent by registered or certified mail to the Undersigned at the address given herein or last known to the Surety.
Further, the Indemnitors agreed, in Section 8, as follows:
The Surety may settle or compromise any claim, demand, suit or judgment upon any Bond or Bonds executed by it, and any such settlement or compromise shall be binding upon the Undersigned . . .
In Section 9, it is provided that “[t]he vouchers or other evidence of payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the Undersigned to the Surety.”
By Section 11 of the Indemnity Agreement, the Indemnitors agreed to provide all documents and financial information necessaiy in the investigation and defense of any claims made on the Bonds issued by Seaboard, and to allow the examination of their books and records to that effect.
Still further, in Section 14, the Indemnitors agreed as follows:
In any action, suit or proceeding brought by the Surely to enforce any of the covenants of this instrument, the costs and expenses, including attorneys fees, incurred by the Surety in connection therewith may be included in any judgment or decree rendered against the Undersigned . . .
Certainly, one of the most significant of the sections of the Indemnity Agreement is Section 13. It reads in its entirety:
Ifit becomes necessaiy or advisable in the judgment of the Surety to control, administer, operate or manage any or all matters connected with the performance of any Bonded Contract for the purpose of attempting to minimize any ultimate loss to the Surety, or for the purpose of discharging its obligations of suretyship, the Undersigned hereby expressly covenant and agree that such action on the part of the Surety shall be entirely within its rights and remedies under the terms of this instrument and as Surety, and do hereby fully release and discharge the Surety, in this connection, from liability for all actions taken by it or for its omissions to act, except for deliberate and willful malfeasance.
On June 18, 1998, Interstate and the Town of Greenfield (“Greenfield”), Massachusetts, entered into a construction contract under which Interstate was to provide general contracting services for the renovation of the Greenfield Middle School. In that same month, Seaboard, on behalf of Interstate, issued a Payment Bond and a Performance Bond, each in the penal amount of $10,085,224.00, in connection with the Greenfield Middle School job.
Disputes have arisen between Greenfield and Interstate, and between several subcontractors, material-men and suppliers and Interstate, resulting in several claims against the Bonds issued by Seaboard and certain suits against Seaboard.
Further, in August of 2000, Greenfield advised Seaboard that Interstate had ceased performing under its contract and requested that Seaboad, as surety on the Performance Bond, complete the project. There followed negotiations between Seaboard and Greenfield over a takeover agreement under which Seaboard agreed to engage subcontractors and vendors to complete the work on the Greenfield Middle School.
Greenfield, however, refused to proceed with the take-over agreement and proceeded to engage its own subcontractors and vendors and then demanded that Seaboard pay the costs therefor. As a result, Seaboard brought a claim against Greenfield in the Federal Court in Springfield seeking declaratory relief. On March 7, 2003, the Federal Court granted Seaboard’s motion for summary judgment declaring that Greenfield’s refusal to allow Seaboard to complete the Middle School work rendered the Performance Bond null and void and discharged Seaboard from any liability under that Bond.
As a result of the claims and actions arising from Greenfield Middle School job, Seaboard, by letter dated April 12, 2001, initially made written demand on the Indemnitors to make a deposit of collateral security under the Indemnity Agreement in the amount of $139,240.00, which represented the loss reserve set by Seaboard as of that date. Later, by letter dated March 12,2003, Seaboard again demanded that the Indemnitors make a collateral deposit, this time in the amount of $844,020, that being the amount then set as a loss reserve by Seaboard.
Also, by letter dated May 2, 2001, Seaboard made a written demand on the Indemnitors to produce their books, records and other financial data as required by the Indemniiy Agreement.
Seaboad has incurred, and says that it expects that it will continue to incur, substantial expenses that are the obligations of the Indemnitors under the Indem-niiy Agreement. Because the present motion seeks only summary judgment on the issue of liabiliiy and specific performance of only the amount demanded because of the setting by Seaboard of a loss reserve, the Court will not here get involved in what may be factually intense debates over the actual amounts *589 involved and whether they are due under the Indemnity Agreement.[4]

DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party, Seaboard, bears the burden of affirmatively demonstrating that there is no triable issue of fact on the question of the Indemnitors’ liability under the Indemnity Agreement. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The true focus of the present motion is the Indemnity Agreement and the requirements contained therein. “Summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.” Mass.R.Civ.P. Rule 56(c). Therefore, liability issues on Count I (for specific performance of the Indemnity Agreement), Count II (for breach of the Indemnity Agreement) and Count VI (for declaratory judgment on the Indemnity Agreement) are ripe for consideration at this time. Count III (for common-law indemnity), Count IV (for quia timet) and CountV (for violation of G.L c. 93A), however, all need the resolution of material facts and cannot be determined on a Rule 56 motion.
The Indemnity Agreement’s plain language becomes critical. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written agreement. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
“Indemnity provisions are not read with any bias in favor of the indemnitor and against the indemnitee; rather, such provisions are to be fairly and reasonably construed to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished.” Urban Investment & Development Co. v. Turner Construction Co., 35 Mass.App.Ct. 100, 107 (1993).
A key legal issue in this case is the effect of the “deliberate and willful malfeasance” exception in Section 13 of the Indemnity Agreement.
The provisions of the Indemnity Agreement reflect “an intention to provide comprehensive protection to [Seaboard] for any loss which it might sustain because of its obligations on surety bonds.” Peerless Casualty Co. v. Marinucci Bros. & Co., Inc., 336 Mass. 691, 695 (1958). “[A]ll liability, losses, costs, damages, attorneys fees, disbursements, and expenses of every nature” are included. See American Employers’ Insurance Company v. Horton, 35 Mass.App.Ct 921 (1993).
Section 13 of the Indemnity Agreement contains a full release and discharge of Seaboard from liability for all actions taken or omitted by it in connection with any Bond issued to Interstate or Congress, “except for deliberate and willful malfeasance.” Such broad exculpatory clauses, or releases, are routinely enforced. “Whether such contracts be called releases, covenants not to sue, or indemnification agreements, they represent ‘a practice our courts have long found acceptable.” ’ Sharon v. City of Newton, 437 Mass. 99, 105 (2002).
Deliberate and willful malfeasance is a kind of bad faith that constitutes an avoidance that must be specifically pled as an affirmative defense. Mass.R.Civ.P. Rule 8(c). See Demoulas v. Demoulas, 428 Mass. 555, 575 n.16 (1998). It does not appear to have been pled by the Indemnitors in their answer to the amended supplemental complaint. Certainly the Fifth Affirmative Defense does not raise this avoidance, nor do any of the others.
Whether pled or not, no deliberate and willful malfeasance on Seaboard’s part has been demonstrated in the Indemnitors’ opposition. The Indemnitors must show “more than bad judgment, negligence or insufficient zeal.” Hartford Accident and Indemnity Company v. Millis Roofing and Sheet Metal Inc., 11 Mass.App.Ct. 998, 999 (1981). There must be some “implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.” Id. at 999-1000.
*590 The only affidavit filed in opposition to the present motion is that of William A. Nicholson, described therein as “Vice President of Interstate Construction Company.” The affidavit includes much information relating to amounts paid by Seaboard in resolution of claims against the bonds — matters not in issue when deciding liability only — and defenses by Interstate and Congress to the contentions of Greenfield. “In view of the provisions of the indemnity agreement, the attempt by the defendants to attack summary judgment on the ground that blame for the [claims] lay elsewhere is misdirected. To the extent that may be an issue of fact, it is not material as it was only necessary that the bonding company have acted reasonably when it settled the claim[s] against [Interstate or Congress].” Id. at 999.
Nothing in the Nicholson affidavit demonstrates any “implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will,” id. at 999-1000, on the part of Seaboard.
Given the breadth of the release language in Section 13 of the Indemnity Agreement, and the remaining language in that Agreement, summary judgment on the issue of liability only is warranted on Counts I, II and VI of the amended supplemental complaint.
The Court reaches a similar conclusion with regard to the requirement that the Indemnitors must pay $844,020 as collateral for the loss reserve set by Seaboard.
Section 7 of the Indemnity Agreement authorizes Seaboard to set up a reserve “to cover any contingent claim or claims, loss, cost, attorneys fees and/or other expenses in connection with any” Bond. When it does so, the Indemnitors, among others, within ten days after receipt of written demand, must “pay to [Seaboard] current funds in an amount equal to such reserve, and any subsequent increase thereof, such funds to be held by [Seaboard] as collateral . . . with the right to use the same or any part thereof, at any time, in payment or compromise of any judgment, claim, liability, loss, damage, attorneys fees and disbursements or other expenses.” Kimberly Zanotta, in her affidavit in support of the present motion, includes a letter dated March 12, 2003, by which the Indemni-tors were advised that, pursuant to Section 7 of the Indemnity Agreement, “Seaboard has set reserves in the amount of $844,020.00 for its current and projected losses” as a result of issuing Bonds on behalf of Interstate. The letter also includes a demand that the Indemnitors deposit with Seaboard cash or other collateral acceptable to it with a value of $844,020.00.
There is no affidavit in opposition to the Zanotta affidavit. “When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse parly may not rest upon the mere allegations or denials of his pleading, but his response, by affidavit or otherwise, . . . must set forth specific facts showing that there is a genuine issue for trial.” Mass.R.Civ.P. Rule 56(e).
Once again, the plain language of the Indemnity Agreement compels this payment.

ORDER

For the foregoing reasons, Seaboard’s motion for summary judgment on liability is ALLOWED as to Counts I, II and VI such that liability is established thereon and DENIED as to Counts III, IV and V.
Further, the Indemnitors are directed and ordered to pay to Seaboard, as collateral for the loss reserve established, the sum of $844,020.00 in cash, or other collateral acceptable to it, said payment to be made within twenty (20) days from the date hereof.

There are seven counts in the amended supplemental complaint. Count VII asserts a fraudulent conveyance by Nicholson to Charlene of certain property in Ipswich, Massachusetts.

Also included as an Indemnitor, but not named as a defendant in this case, is Paul W. Nicholson of Hamilton, Massachusetts.

Of course, Section 9 of the Indemnity Agreement will certainly play a prominent role in many of those debates.